### In re DIXON.

#### (District Court, D. Massachusetts. January 15, 1915.)

#### No. 17447.

1. BANKRUPTCY ⬅136—PROPERTY IN BANKRUPT'S POSSESSION—EVIDENCE.

On petition for an order directing the bankrupt to turn over money in his possession to his trustee, evidence *held* to show that the bankrupt received, over five years before the filing of the petition, a specified sum, and that a part thereof remained in her possession, authorizing relief.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. ⬅136.]

2. BANKRUPTCY ⬅136—POSSESSION OF PROPERTY BY BANKRUPT—PRESUMPTIONS—RECENT POSSESSION—FALSE TESTIMONY.

Recent possession of property by a bankrupt, accompanied by failure to account for it, justifies an inference that the property remains in his possession, and mere lapse of time does not raise any strong presumption in favor of the bankrupt, and, where the bankrupt fails to explain what has been done with the property, and has testified untruthfully about it, an order directing a delivery thereof to his trustee is justified.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. ⬅136.]

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. BANKRUPTCY ☞136—POSSESSION OF PROPERTY BY BANKRUPT—ORDER TO TURN OVER—BURDEN OF PROOF.**

A petition by a trustee in bankruptcy to compel the bankrupt to turn over to him assets alleged to be in the possession of the bankrupt will be granted where, by a fair preponderance of the testimony, it appears that the bankrupt has assets which have not been turned over.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. ☞136.]

**4. BANKRUPTCY ☞136—COMPELLING BANKRUPT TO TURN OVER ASSETS TO TRUSTEE—CONTEMPT PROCEEDINGS—EVIDENCE.**

To justify a commitment for contempt for refusal to comply with an order directing a bankrupt to turn over assets to his trustee, the court must be satisfied beyond reasonable doubt that the assets are in the possession of the bankrupt, who is able to turn the same over.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 233, 235; Dec. Dig. ☞136.]

In Bankruptcy. In the matter of Ida A. Dixon, bankrupt. Petition to review an order of the referee denying a petition by the trustee. Relief granted.

Fred A. Fernald, of Boston, Mass., for trustee.
Lloyd Makepeace, of Boston, Mass., for bankrupt.

MORTON, District Judge. This is a petition to review an order of the referee denying a petition brought by the trustee in bankruptcy, praying that the bankrupt be ordered to turn over to him, as property to be administered, certain money alleged now to be in the bankrupt's possession.

The facts are as follows:

On December 23, 1905, the bankrupt received $4,850, being the proceeds of the sale of a farm, called the Currier farm. The money here in question is said by the trustee to be a part of that sum.

The bankrupt admits that the $4,850 came into her hands; but she testifies that, after paying $120 to the real estate broker, she turned the rest of it over to her father immediately on receipt of it in 1905, and has never since had any part of it. She further testifies that the money was turned over in the form of bills; that her father, then over 80 years old, continued to live with her until his death, about two years later; and that she does not know what he did with the money, and never saw it, or any part of it, after having turned it over to him. The question at the bottom of this controversy is whether her statement is true.

Six months after her receipt of the money, in June, 1906, a decree had been entered against her in the state courts of New Hampshire which called for the repayment by her of more than $20,000, property which she had obtained without legal right thereto from one Merrill, an old man who had lived in her family. She was about $2,000 short of the amount required, and was brought before the court for failing to satisfy the decree. Her counsel at that time, Mr. Martin, and the then opposing counsel, Mr. Sawyer, testify in these proceedings that she then said that she could not raise the $2,000; that thereupon she was asked about this money from the Currier farm; that she replied

"that she put the currency (from the sale of the Currier farm) into the safety deposit box in the National State Capital Bank," but, on account · of the decision which had been made in the state court case, she would have to pay that money over to her father; that the opposing counsel assured her that her right to that money was not affected by the decree against her, and that she ought to use it in satisfaction of the decree; that the judge made an order that she pay $2,000, and "it was arranged when Mrs. Dixon left the courtroom that she should produce $2,000 out of that fund * * * to comply with the order of the court"; that she thereupon went, in the custody of an officer, to the safe-deposit box, and shortly returned with $2,000 in cash, which she . paid over on the contempt proceedings. Both these witnesses say that at that time she made no claim that the money from the Currier farm had been paid over to her father, and that they knew of no such claim by her before her testimony in these proceedings.

The bankrupt and her husband admit that $2,000 was paid over, but they now testify that it belonged to the latter, and was money which he had saved up during many years as a carpenter, city messenger, etc., and had put away in the safe-deposit box. They both say, also, that her father never paid any board; and her husband testifies that they buried him, by which I understand is meant paid the expenses of the funeral.

Both the bankrupt and her husband are intelligent persons. I find it difficult to believe that the husband, a man of no considerable property or income, who did business with banks, and for a time had a mortgage on his property, hoarded his savings in cash in a safe-deposit box to such an amount as $2,000, just as I find it very difficult to believe that over $4,700 was turned over in cash by the bankrupt to her father, an old man living in her family, which was a small one, in moderate circumstances, and thereafter was entirely lost sight of by her and her husband. No administration was taken out on her father's estate. What became of the money after it reached her father's possession? Where was it when he died, still a member of her family, about two years later? The only answer which she and her husband make is that they do not know and never heard. The story which the bankrupt and her husband tell about the matter is improbable in itself; it is impeached by the testimony of Mr. Martin and Mr. Sawyer, and is rendered still more doubtful by various incidental facts which need not be stated in detail.

[1, 2] It seems to me altogether probable, and I accordingly find, that in June, 1906, the bankrupt had $4,730 (being $4,850, less $120 paid as commission on the sale of the farm), belonging to her, in cash in a safe-deposit box, that $2,000 was taken therefrom by her at that time, and that the balance of the money was then left in her possession.

This being so, there remains the difficult question whether the money may be found to be still in her possession at the time of this petition. The bankruptcy petition was not filed until over five years after the payment of the $2,000, and there is no direct evidence what has been done in the meantime with the balance of the money. Is it still in the

bankrupt's possession? The principal circumstances warranting such a finding are the absence of evidence as to any other disposition of it and the present concealment or perjury in regard to it which have been resorted to by the bankrupt and her husband. Plainly, no true account of what became of the money has been given. The law is well settled that "recent" possession of property by the bankrupt, accompanied by a failure to account for it, justifies an inference that the property is still in the bankrupt's possession. And bankrupts have been imprisoned for failure to turn over property in cases of that character. Re Wm. H. Goodrich, 184 Fed. 9, 106 C. C. A. 207, Dodge, J., Mass. District, May 26, 1910; Re Lasky (D. C.) 163 Fed. 99; Re De Gottardi (D. C.) 114 Fed. 329; Re Richards (D. C.) 183 Fed. 501; Re Weber Co., 29 Am. Bankr. Rep. 217, 200 Fed. 404, 118 C. C. A. 556. What is meant by "recent" has, so far as I am aware, not been defined; but it does not seem to me that the mere lapse of time raises any strong presumption in favor of the bankrupt. If, during the years, the money had been spent or disposed of, nothing was easier for the bankrupt than to say so; but she makes no such claim. She has failed to explain what really was done with money, and has testified untruthfully about the matter. Where it appears that property was in a person's hands, and that fabricated evidence has been given by that person concerning the alleged items of payment or discharge, the natural inference is that falsehood has been resorted to, because no true and correct items of discharge exist; i. e., that the property is still in the possession of the person into whose hands it was traced. On the fair preponderance of the evidence, it seems to me that the money is still in the bankrupt's hands.

[3, 4] It is argued that this petition should not be granted, unless the court would, upon the evidence before it, commit the bankrupt if the property is not turned over. I doubt the soundness of that contention. In order to justify a commitment for contempt for refusal to comply with an order, the court must be satisfied beyond any reasonable doubt that the property is in fact in the bankrupt's possession, and that the bankrupt is able to turn it over; while, upon a petition like this, the test is, whether, by a fair preponderance of the testimony, it appears that the bankrupt has assets which have not been turned over. Re Cole, 144 Fed. 392, 75 C. C. A. 330; Id., 163 Fed. 180, 189, 90 C. C. A. 50, 23 L. R. A. (N. S.) 255; In re Cunney, 225 Fed. 426, Lowell, J., Mass. District, January 8, 1904.

In this respect these proceedings are closely analogous to a suit in equity looking to a decree for the payment of money. Such decrees are entered upon a fair preponderance of the testimony, but are not followed up by commitment for contempt, unless the contempt be proved beyond a reasonable doubt. Moreover, the making of an order on this petition may have other effects than to lay the foundation for contempt proceedings. Aside from the implication that the bankrupt has testified falsely, and thereby disentitled herself to discharge, it is still unsettled whether failure on her part to comply with such an order, whether contemptuous or not, does not bar the discharge. There is the difficulty that the bankrupt may have parted with the money in

some other way than by giving it to her father, as she says, and may find the true explanation of what was done with it obstructed by her misstatements concerning it. Of course, she is not to be punished for perjury on contempt proceedings. An order of committal ought not to be made, unless she is in fact able to turn over the money. Collier on Bankruptcy (10th Ed.) pp. 622, 623; In re McNaught, 225 Fed. 511, No. 6075, Lowell, J., Dec. 22, 1903. The possibility of embarrassment to the bankrupt of the kind indicated seems to me, however, no reason for withholding an order on this petition. That situation can more properly be dealt with on contempt proceedings, if those shall hereafter be instituted, than on this petition.

The trustee agrees that the $2,000, plus $120 paid by her as commission on the sale of the real estate, may be credited to the bankrupt. For the balance, $2,730, it seems to me that he is entitled to an order as prayed for.